IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FILED

05 AUG 22 PM 3:49

CLERK-ALBUQUERQUE

AYSHEH, INC.,

    Plaintiff,

vs.

Civil No. 04-966 BB/WDS

MARYLAND CASUALTY
COMPANY,

    Defendant.

## DEFENDANT'S REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Maryland Casualty Company hereby requests that the Court enter the following findings of fact and conclusions of law following the trial on the merits. Defendant has not yet received copies of Plaintiff's exhibit and witness list nor copies of the exhibits. Thus, Defendant reserves the right to update this document after having an opportunity to review those documents.

### Findings of Fact

1. The Court has jurisdiction over the subject matter of and the parties to this litigation.

2. Gallup Indian Plaza is a commercial property on the Eastside of Gallup, which is owned by Mohammad Aysheh through one or several business entities.

3. Gallup Indian Plaza currently includes a Chevron gas station, a jewelry store, a restaurant and several hotels, including a La Quinta Inn. At the time of the relevant this action, it included a hotel, gas station, jewelry store and restaurant.



4. These businesses lease space from Mohammad Aysheh, through one or various business entities, which Mohammad Aysheh owns individually or with members of his family.

5. Mohammad Aysheh owns other businesses in Gallup, New Mexico, including Gilbert Ortega's Jewelry Store.

6. Mohammad Aysheh previously operated a jewelry store at the Gallup Indian Plaza location before he turned that business over to his son, Rafat Aysheh, who is the sole owner of Aysheh, Inc.

7. The jewelry store space located at Gallup Indian Plaza is leased by Aysheh, Inc. for the purposes of operating the jewelry store.

8. As part of the lease for the jewelry store, Aysheh, Inc. agreed to purchase commercial property insurance, among other policies, to insure Gallup Indian Plaza, Aysheh, Inc. and the other businesses located at Gallup Indian Plaza.

9. Plaintiff purchased a Maryland Casualty Company Precision Portfolio Policy # PPS 37802148 (the "Policy") to cover Gallup Indian Plaza. The Policy was purchased from an independent insurance agent in Gallup, Bubany Insurance Agency, Inc through John Mackler. The Policy included the following coverages: (1) commercial property; (2) commercial general liability; and (3) commercial umbrella. The dates of coverage for the Policy were April 1, 2001 through April 1, 2002.

10. Bubany Insurance Agency, Inc. is an independent insurance broker who sells insurance from a wide variety of insurance companies.

11. John Mackler served as Gallup Indian Plaza's insurance agent at Bubany Insurance Agency, Inc. from the mid 1990s. He helped Mohammad Aysheh purchase insurance

2

policies from insurance companies other than Maryland Casualty Insurance Company, including Mountain States, CNA, National Flood, Progressive and Fireman's Fund.

12. Even after Rafat Aysheh leased the jewelry store at Gallup Indian Plaza through Aysheh Inc. Mr. Mackler's primary contact regarding the purchase of insurance for Gallup Indian Plaza was Mohammad Aysheh.

13. Mr. Mackler informed Mohammad Aysheh that insurance policies do not cover everything. He explained that things can be excluded from coverage. Mr. Mackler did this with every client. It was his normal business practice.

14. While Mr. Mackler was aware that Mohammad Aysheh did not read English, he never informed anyone employed by Defendant of this fact. Mr. Mackler was also aware that Mr. Aysheh employed individuals that helped him understand the contents of complex documents, such as an insurance policy.

15. The commercial property portion of the Policy provided the following coverages: (1) scheduled buildings; (2) an automatic building increase; (3) scheduled personal property; (4) peak season personal property; (5) accounts receivable; (6) antennae and satellites; (7) dependent properties; (8) newly acquired properties; (9) loss of business income and extra expense; (10) debris removal – each location; (11) deferred payments; (12) equipment and media; (13) employee dishonesty; (14) fine arts – blanket; (15) fire department service charge; (16) fire extinguisher equipment recharge; (17) forgery or alteration; (18) free-standing fences and walls; (19) installation; (20) inventory and appraisal; (21) leasehold interest; (22) lock and key replacement; (23) money & securities – inside the premises/outside the premises; (24) money orders & counterfeit currency; (25) newly acquired or constructed buildings – 180 days; (26) off-premises power or water failure; (27) patterns, dies & molds; personal effects of others &

personal property of employees; (28) personal property at newly acquired or constructed buildings – 180 days; (29) personal property at other locations (including exhibitions); (30) personal property in transit; (31) pollution clean-up and removal – each location; (32) salespersons samples; (33) signs; (34) spoilage; (35) tools & equipment including communications devices – blanket; (36) trees, shrubs, plants and lawns; (37) unauthorized business card use; and (37) valuable papers & records.

  16. The Policy provides the following in relevant part to this litigation:

### BUILDING AND PERSONAL PROPERTY COVERAGE FORM
### 9S1001 Ed. 4-99

**COVERAGE**

We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.

**I. COVERED PROPERTY**

The following items are Covered Property in this policy if shown in the Declarations along with a Limit of Insurance.

  A. Building, meaning buildings and structures scheduled in the Declarations at a "described premise".

  B. The following property if within 1000 feet of the "described premises":

    1. Completed additions;
    2. Permanently installed fixtures, machinery and equipment;
    3. Indoor and outdoor equipment and other personal property used to maintain or service the "described premises";
    4. Unless covered by other insurance:
      (a) Incomplete additions and their component parts; and
      (b) Materials, equipment, supplies and temporary structures to be used in completing those additions;

      C.       However, Covered Property does not include:

            1.       Land, water, growing crops, bridges, unattached retaining walls, patios or paved surfaces.

17. On May 12, 2000, Mohammad Ayshch contacted his fire suppression company regarding testing and inspecting the fire sprinkler system, which included testing the pressure in the fire suppression line.

18. On February 23, 2001, the City of Gallup shut-off the main water line to repair a leak in a fire hydrant. Six-days later the City shut off the water again to repair another damaged valve.

19. On April 28, 2001, Mohammad Ayshch noticed water seeping from a crack in the parking lot near the jewelry store and restaurant. Mohammad Ayshch did not think much of it because he figured it was associated with the restaurant on the Property.

20. On May 1, 2001, the owner of the gas station at Gallup Indian Plaza, one of Mohammad Aysheh's tenants, contacted Mr. Aysheh and informed him that some of his customers were complaining about water in the gas sold at the station. Between that day and May 21, hundreds of gallons of water were pumped from the gas station's fuel tanks.

21. On May 21, 2001, Mohammad Aysheh contacted the City of Gallup thinking the leak affecting the tanks came from a City waterline. The City could find no leak.

22. On May 22, 2001, Mohammad Aysheh had drilled 12 holes in the Gallup Indian Plaza parking lot to determine the origins of the leak. Each of the holes quickly filled with water according to the Plaintiff. The water in the fuel tank problem continued.

23. On June 5, 2001, Williams Enterprises conducted a check of the water meters and found no leaks in any water systems. Yet, through June 2001, water continued to collect in the

fuel tank. On July 2 and 3, 2001, Heath Consultants conducted a search for water leaks and found none.

24. Plaintiff continued to search for the origin of the water leak. On December 29, 2001, Williams Enterprises found the real culprit, a water leak in a 4" fire sprinkler line. When Williams Enterprises excavated the area, they found water gushing from a "T" connection resting on an 18" by 24" concrete block.

25. On December 31, 2001, Williams Enterprises broke through the concrete pad next to the gas station and jewelry store to provide ventilation so the soil beneath the building would dry. Williams then repaired the leak and completed that process by April 2, 2002.

26. Defendant reimbursed Plaintiff for the cost of Williams Enterprises repairing the leak and for providing the ventilation described above.

27. On March 19, 2003, Rafat Aysheh filed a Partial Proof of Loss. Defendant has never contested the validity of the proof of loss. Defendant retained Crawford & Company to act as the local adjusters and Crawford assigned Jim Allen to the case. Mr. Allen interacted with Mohammad Aysheh and investigated the claim.

28. Plaintiff claims that the water leak damaged the parking lot, concrete pad under the gas pumps and over the gas tanks for those pumps, the columns holding up the canopy over the pumps, the jewelry store building, including the residence on the second floor of that building, and the gas station building.

29. After consulting with Defendant, Mr. Allen retained an engineer to conduct an inspection and analysis of the property. This engineer eventually withdrew from the project because of health problems.

30. Mr. Allen then retained Engineering Inc., and Douglas McLeod, a certified engineer, conducted an inspection of the property. He issued a report on this inspection.

31. Douglas McLeod analyzed Gallup Indian Plaza to determine whether the alleged damages were actually caused by the water leak and to otherwise review the engineering and construction portions of the claim. Mr. McLeod prepared two different reports regarding the results of his examination. In the second report, Mr. McLeod analyzed the estimates to repair the damages actually caused by the water leak.

32. Defendant retained Paul Davis Restoration, through Kim Briggs, to provide an estimate to repair those damages that Mr. McLeod found were actually caused by the water leak and which did not constitute repairs to and of paved surfaces or improvements.

33. Based on the reports from Mr. McLeod and Mr. Briggs, Defendant sent a coverage letter dated April 24, 2003, to Plaintiff explaining coverage and enclosing a check for $19,374.49, for damages actually caused by the water leak to covered property.

34. Defendant explained in this letter that it would not pay for the following: (1) proposed repairs to damage that were not caused by the water leak; (2) proposed repairs to paved surfaces, which are expressly excluded from coverage under the insurance policy; and (3) proposed repairs that were in reality improvements to Gallup Indian Plaza, rather than repairs to damages caused by the water leak.

7

## Conclusion of Law

1. The Court has jurisdiction over the subject matter of and the parties to this litigation.

2. The Policy is not ambiguous. See <u>Alvarez v. Southwestern Life Ins. Co.</u>, 86 N.M. 300, 523 P.2d 544 (1974).

3. Mohammad and Rafat Aysheh's expectation that the Policy would cover any possible loss that they or Aysheh, Inc. could incur in Gallup Indian Plaza was not reasonable. See <u>Berlangieri v. Running Elk Corp.</u>, 2002-NMCA-046, 132 N.M. 92, 44 P.3d 538, aff'd on other grounds, 2003-NMSC-024, 134 N.M. 341, 76 P.3d 1098, and <u>Barth v. Coleman</u>, 118 N.M. 1, 878 P.2d 319 (1994).

4. Bubany Insurance Agency, Inc. was an independent insurance broker and was the agent for Aysheh, Inc. in its transaction with Defendant. Thus, whatever duties Bubany Insurance Agency, Inc. had to inform Plaintiff of the limitations and exclusions in the Policy cannot be imputed to Defendant.

5. The Policy clearly provided that paved surfaces did not constitute covered property under the terms of the Policy. Thus, Defendant properly denied Plaintiff's claim for the repair costs for damages to paved surfaces, including but not limited to the parking lot, side walks and gas pump area at Gallup Indian Plaza.

6. The check for $19,374.49 that Defendant sent to Plaintiff, enclosed with a letter explaining coverage, fully compensated Plaintiff for the damages to covered property actually caused by the water leak.

7.     Those claimed repair costs that were not covered were for repairs to paved surfaces or for other items of damages that were either not caused by the water leak or constituted improvements rather than repairs.

8.     Defendant did not act in bad faith in its handling of Plaintiff's claims. See UJI 13-1702 NMRA.

9.     Defendant is entitled to an award of taxable costs against Plaintiff.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By_____
Seth L. Sparks
Attorneys for Maryland Casualty Company
P. O. Box 1888
Albuquerque, NM 87102
Phone: (505) 765-5900
Fax: (505) 768-7395

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed to counsel of record on the 22nd day of August, 2005, addressed as follows:

David R. Jordan
JORDAN & ROSEBROUGH, P.C.
Attorneys for Plaintiff
P.O. Box 840
Gallup, NM 87305

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

BY_____
Seth L. Sparks